UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEAWOLF TANKERS INC., <br><br> Plaintiff, <br><br> - against - <br><br> LAUREL SHIPPING LLC, <br><br> Defendant. | **CASE NO.** 20-cv-05198 (RA) |
| FREEPOINT COMMODITIES LLC, AND FREEPOINT COMMODITIES SINGAPORE PTE LTD., <br><br> Plaintiffs, <br><br> - against - <br><br> RIDGEBURY KILO LLC AND SEAWOLF TANKERS INC., <br><br> Defendants. | **CASE NO.** 20-cv-07246 (RA) |

**SEAWOLF'S MOTION FOR**
**SUMMARY JUDGMENT AGAINST LAUREL SHIPPING LLC**

i

# **TABLE OF CONTENTS**

                                                                                                                 **Page**

TABLE OF AUTHORITIES ................................................................................................. II

INTRODUCTION .................................................................................................................. 1

STATEMENT OF RELEVANT FACTS .............................................................................. 1

I.       BACKGROUND AND RELEVANT PROVISIONS OF THE VOYAGE
            CHARTER AGREEMENT ........................................................................................ 1

II.      MATERIAL UNDISPUTED FACTS CONCERNING SEAWOLF'S DEVIATION
            IN INTERIM PORT COSTS CLAIM ...................................................................... 2

SUMMARY JUDGMENT STANDARD ............................................................................... 4

ARGUMENT .......................................................................................................................... 5

    I.       PAYMENT OF SEAWOLF'S DEVIATION AND INTERIM PORT INVOICE IS
               DUE AND OWING UNDER THE CHARTER............................................................ 5

    II.     CALCULATION OF DAMAGES ............................................................................ 12

    III.   PRE-JUDGEMENT INTEREST ............................................................................. 12

    IV.   ATTORNEYS' FEES ............................................................................................... 13

CONCLUSION ..................................................................................................................... 14

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................4, 5

*Balderman v. U.S. Veterans Admin.*,
    870 F.2d 57 (2d Cir. 1989)................................................................................................4

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..........................................................................................................4

*Cinema North Corp. v. Plaza at Latham Assoc.*,
    867 F.2d 135 (2d Cir. 1989)..............................................................................................5

*Compagnia DiNavigazione Mauritius Rome v. Kulukundis*,
    182 F. Supp. 258 (E.D.N.Y.1959), *aff'd.*, 277 F.2d 161 (2d Cir.1960) ...................................7

*Eisemann v. Greene*,
    204 F.3d 393 (2d Cir. 2000)............................................................................................13

*Genetics Int'l v. Cormorant Bulk Carriers, Inc.*,
    877 F.2d 806 (9th Cir. 1989) ............................................................................................6

*Greenstone Shipping Co., S.A. v. Transworld Oil, Ltd.*,
    588 F. Supp. 574 (D. Del. 1984)......................................................................................6

*H&A Trading Co. v. Margo Farms Del Caribe, Inc.*,
    No. 90-2650CCC, 1991 U.S. DIST. LEXIS 20768 (D.P.R. Dec. 13, 1991) ..............................7

*Hellenic Lines, Ltd. v. Director General of India Supply Mission*,
    319 F. Supp. 821 (S.D.N.Y. 1970)..................................................................................10

*Heyman* v. *Commerce & Indus. Ins. Co.*,
    524 F.2d 1317 (2d Cir. 1975)............................................................................................5

*Hirschfeld v. Bd. of Elections in City of New York*,
    984 F.2d 35 (2d Cir. 1993)..............................................................................................13

*Indep. Bulk Transp., Inc. v. M/V Morania Abaco*,
    676 F.2d 23 (2d Cir. 1982)..............................................................................................12

*Leberman v. John Blair & Co.*,
    880 F.2d 1555 (2d Cir. 1989)............................................................................................5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................................................5

*Metallgesellschaft A.G. v. M/V Capitan Constante*,
    790 F.2d 280 (2d Cir. 1986) ................................................................................................6, 7

*Moran Towing Corp. v Young*,
    597 F. App'x 33 (2d Cir. 2015) ............................................................................................12

*NPR, Inc. v. Avant Import & Export*,
    No. 95-1417 (HL), 1996 U.S. Dist. LEXIS 20242 (D.P.R. Dec. 3, 1996) .............................10

*Pension Benefit Guaranty Corp. v. LTV Corp.*,
    875 F.2d 1008 (2d Cir. 1989) ..................................................................................................5

*Puerto Rico Marine Management v. Ken Penn Amusement, Inc.*,
    574 F. Supp. 563 (W.D. Pa. 1983) ..........................................................................................6

*Scotto v. Almenas*,
    143 F.3d 105 (2d Cir. 1998) ....................................................................................................5

*Sun Refining and Marketing Co. v. Goldstein Oil Co.*,
    620 F. Supp. 121 (E.D. Mo. 1985), aff'd in part, reversed in part, 801 F.2d 343
    (8th Cir. 1986) .........................................................................................................................6

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
    241 F.3d 135 (2d Cir. 2001) ....................................................................................................8

**Other Authorities**

Fed. R. Civ. P. Rule 54 ..........................................................................................................13, 14

Fed. R. Civ. P. 56 ......................................................................................................................1, 4, 5

NY CPRL § 5004 (2012) ................................................................................................................13

*The Aries*, 1 L1.L.R. 334, 341 (1977) ...........................................................................................7

*The Olympic Brilliance*, 21 L1.L.R. 177, 177-78 (1981) ..............................................................6

2 CARVER, CARRIAGE BY SEA (13th Ed. 1982) ...............................................................................7

10 WILLISTON, THE LAW OF CONTRACTS (3d Ed. 1957) ..................................................................8

JULIAN COOKE, et al., VOYAGE CHARTERS (4th Ed. 2014) ..........................................................6, 8

## INTRODUCTION

Plaintiff Seawolf Tankers Inc. ("Seawolf"), by and through their attorneys, Holland & Knight LLP, respectfully move the Court, pursuant to Fed. R. Civ. P. 56, for an order granting summary judgment against Laurel Shipping LLC ("Laurel") and in favor of Seawolf for compensation for freight due and owing under the voyage charter, dated November 20, 2019 between Seawolf as disponent owner and Laurel as charterer in the amount of $2,781,120.06, plus interest and attorney's fees.

## STATEMENT OF RELEVANT FACTS

**I.   BACKGROUND AND RELEVANT PROVISIONS OF THE VOYAGE CHARTER AGREEMENT**

Seawolf chartered the M/T RIDGEBURY PROGRESS (the "Vessel") to Laurel pursuant to a voyage charter party agreement dated November 20, 2019 (the "Voyage Charter").  56.1 Statement of Undisputed Facts In Support of Seawolf's Motion for Summary Judgment dated October 20, 2021, ("56.1 Statement"), ¶ 1; the Declaration of Deepak Laishram dated October 20, 2021 (the "Laishram Decl."), Exhibit ("Laishram Exhibit") 1.  The Voyage Charter provides for a single voyage on the Vessel for the carriage of various grades of fuel oil from port(s) in the U.S. Gulf and Caribbean ranges for discharge on the west coast of India or the Singapore – Japan ranges. The voyage Charter contemplates carriage of one of several petroleum products onboard the Vessel from US Gulf of Mexico, Caribbean, Bahamas or Columbia to the far east, at Laurel's option as charterer.  56.1 Statement, ¶ 2; Laishram Exhibit 1 at 3.  While the Voyage Charter contemplates discharge in multiple ports, freight was stated on the basis of only one discharge port and was payable in advance.  *Id*. at ¶ 3.  The Voyage Charter includes an Interim Port Clause, which clause states in relevant part:

> CHARTERERS TO PAY FOR ADDITIONAL INTERM LOAD/DISCH PORT AT COSTS WITH ADDITIONAL STEAMING TIME TO BE INCURRED FOR SUCH DEVIATION WHICH EXCEEDS DIRECT PASSAGE FROM FIRST LOADPORT TO FINAL DISCHPORT. TIME TO COUNT FROM ARRIVAL PILOT STATION INTERIM LOAD/DISCHARGE PORT UNTIL DROPPING LAST OUTWARD PILOT INTERIM LOAD/DISCH PORT … DEVIATION AND TIME USED TO COUNT AGAINST LAYTIME UNTIL LAYTIME HAS EXPIRED THEN TO BE CALCULATED AT DEMURRAGE RATE PER DAY PRO RATA PLUS COSTS FOR ADDITIONAL BUNKERS CONSUMED … AND PORT COSTS AS PER AGENTS D/A TO BE PAID TOGETHER WITH FREIGHT AS PER OWNERS TELEXED INVOICE … .

*Id*. at ¶ 4; Laishram Exhibit 1 at 5. Pursuant to the Interim Port Clause in the Voyage Charter, in the event Laurel selected two or more discharge ports Laurel would pay additional freight at the demurrage rate stated in the Voyage Charter (i.e., $60,000 per day) for all time from the Vessel's arrival at the first discharge port until the Vessels departure from the first discharge port, plus all associated additional bunker and port costs. *Id*. at ¶ 5; Laishram Exhibit 1 at 4 – 5..

## II. MATERIAL UNDISPUTED FACTS CONCERNING SEAWOLF'S DEVIATION IN INTERIM PORT COSTS CLAIM

Laurel ordered the Vessel to load a partial cargo of fuel oil at St. Croix, U.S. Virgin Islands. *Id*. at ¶ 6. The Vessel arrived and tendered Notice of Readiness to load the partial cargo of fuel oil at St. Croix on December 28, 2019. *Id*. at ¶ 7. The Vessel completed loading partial cargo at St. Croix on December 31, 2019, and then sailed to Freeport, Bahamas to load additional fuel oil cargo, which fuel oil was to be comingled onboard the Vessel with the product previously loaded at St. Croix as per Laurel's orders. *Id*. at ¶ 8. Upon completion of loading in Freeport, Charterer had loaded on to the Vessel a total of approximately 290,000 MT of comingled or "blended" fuel oil (Collectively, the "**Cargo**"). *Id*. at ¶ 9. Initially, Laurel ordered the Vessel to the Singapore / Malaysia range *via* the cape of Good Hope to discharge the full Cargo. Voyage Orders were transmitted to Dietze & Associates, L.L.C. ("Dietze"), the broker identified in the Voyage Charter Agreement. *Id*. at ¶ 10. The initial voyage orders called for only one discharge port for the full

Cargo, either at berth in Malaysia or Singapore, or *via* ship-to-ship ("**STS**") at the Tanjung Pelepas anchorage in Malaysia. *Id*. at ¶ 11.

On April 14, 2020, Laurel updated its initial voyage orders and directed the Vessel to discharge the full Cargo *via* STS to the FSU NEW PROSPERITY at the Tanjung Pelepas anchorage. *Id*. at ¶ 12. The Vessel arrived at the Tanjung Pelepas anchorage and tendered notice of readiness to commence discharge operations on April 24, 2020. *Id*. at ¶ 13. Discharge operations as contemplated in the April 14, 2020, voyage orders did not occur. *Id*. at ¶ 14. Rather, after arriving at Tanjung Pelepas anchorage the Vessel was ordered to stand by for further instructions, and Laurel and the cargo interest began discussing revised voyage orders. *Id*. at ¶ 15.

On May 25, 2020, revised voyage orders were issued to the Vessel. *Id*. at ¶ 16. The May 25, 2020 voyage orders directed the Vessel to partially discharge the Cargo *via* STS at Tanjung Pelepas anchorage, to load additional fuel oil *via* STS at Tanjung Pelepas anchorage, to blend the newly loaded fuel oil with the original Cargo remaining onboard after partial discharge at the Tanjung Pelepas anchorage, and then to depart the anchorage and discharge the comingled Cargo remaining onboard (approximately 146,764 metric tons) at berth in China. *Id*. at ¶ 17.

From May 25, 2020, to June 7, 2020, while at the Tanjung Pelepas anchorage the Vessel performed the discharge, loading, and onboard blending operations as directed by the May 25, 2020, voyage orders. *Id*. at ¶ 18. The Vessel departed the Tanjung Pelepas anchorage on June 7, 2020. *Id*. at ¶ 19. On June 9, 2020, voyage orders were issued directing the Vessel to discharge the approximately 147,487.671 metric tons of comingled Cargo remaining onboard at Hauyang Terminal, Guangdong China. *Id*. at ¶ 20. The Vessel performed the June 9, 2020, voyage orders. *Id*. at ¶ 21. Pursuant to Laurel's various voyage orders issued under the Voyage Charter, the Vessel was at Tanjung Pelepas anchoarage (the first or interim discharge port) for a total of 44.275 days

(15:00 local time on April 24, 2020 to 21:36 local time on June 7, 2020). *Id*. at ¶ 22. The Vessel was then ordered to a second discharge port in Guangdong China. *Id*. at ¶ 23. On June 17, 2020, Seawolf issued to Laurel a Deviation & Interim Port Invoice for amounts due pursuant to the Interim Port Clause in the Voyage Charter for the Vessel's time and costs while at Tanjung Pelepas anchorage in the amount of $2,781,120.06. *Id*. at ¶ 24; Laishram Exhibit 11. The Deviation & Interim Port Invoice includes charges for the Vessel's time at Tanjung Pelepas anchorage (44.275 days X $60,000 = $2,656,500) (less 2.5% brokers commission ($66,412.50)), and costs for bunkers consumed by the Vessel while at Tanjung Pelepas anchorage (483.17 of very low sulfur fuel oil at the cost of $342 USD per metric tons ($165,244.14) and 37.98 metric tons of low sulfur marine gas oil at the costs of $679 USD per metric tons ($25,788.42) ($191,032.62 in total)). *Id*. at ¶ 25. As of the date of this filing, Laurel has not paid the Deviation & Interim Port Invoice. *Id*. at ¶ 26.

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a): "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (referring to previous version of the rule).[1] In determining whether partial summary judgment on a discrete issue is proper, only those matters pertaining to the substantive law governing the issues presented for partial summary judgment are relevant to determine whether a genuine issue of fact exists. *See, e.g., Anderson*, 477 U.S. at 248. Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. U.S. Veterans Admin.*, 870 F.2d 57, 60 (2d Cir. 1989).

---

[1] Although the text of Fed. R. Civ. P. 56 was substantially changed by the 2010 amendment of the rule "The standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56, Advisory Committee Notes on the 2010 amendment.

4

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). Once the motion for summary judgment is properly made, the burden shifts to the non-moving party, which "'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson, 477* U.S. at 250 (quoting previous version of the rule). The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted), but rather must support the existence of a purported material factual dispute with specific citation to the record materials. Fed. R. Civ. P. 56(c)(1).

While the Court must view the record "'in the light most favorable to the nonmoving party,'" *Leberman v. John Blair & Co.,* 880 F.2d 1555, 1559 (2d Cir. 1989) (quoting *Pension Benefit Guaranty Corp. v. LTV Corp.*, 875 F.2d 1008, 1015 (2d Cir. 1989) (quoting *Cinema North Corp. v. Plaza at Latham Assoc.*, 867 F.2d 135, 138 (2d Cir. 1989) (citation omitted)), and "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman* v. *Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975) (citations omitted), the non-moving party nevertheless "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (citations omitted).

**ARGUMENT**

**I. PAYMENT OF SEAWOLF'S DEVIATION AND INTERIM PORT INVOICE IS DUE AND OWING UNDER THE CHARTER.**

On June 17, 2020, Seawolf invoiced Laurel for Deviation and Interim Port expenses, consisting of 44.75 days of interim port time at Tanung Pelepas anchorage (Malaysia) as well as the bunkers consumed during that time. The total invoiced amount was USD 2,781,120.06. To

date, Laurel has failed to remit payment. Pursuant to the Voyage Charter, payment of these freight costs are due and owing, without offset.

"[F]reight, when not used in a sense to imply the burden or loading of the ship, or the cargo which she has on board, is the hire agreed upon between the owner or master for the carriage of goods from one port or place to another." *Brittan v. Barnaby*, 16. U.S. (21. How.) 527, 16 L. Ed. 177, 62 U.S. 527, 533 (1858). Absent specific clauses in a charter to the contrary, the law implies that freight is to be paid upon delivery of the goods at the port of discharge. *See Metallgesellschaft A.G. v. M/V Capitan Constante*, 790 F.2d 280, 281 (2d Cir. 1986) ("It is a rule of ancient vintage that, where freight is payable on delivery, it should be paid concurrently with the delivery of the goods." (citing Carver, *Carriage of Goods by Sea*, 10th ed. 767)); *See also Genetics Int'l v. Cormorant Bulk Carriers, Inc.*, 877 F.2d 806, 809 (9th Cir. 1989) ("More recent cases have established a clear rule in admiralty law: in the absence of a contractual term to the contrary, freight is due and payable upon delivery regardless of any claims the consignor or buyer might have for shortage or cargo damage on that shipment.") (citing *Metallgesellschaft A.G. v. M/V Capitan Constante*, 790 F.2d 280, 281 (2nd Cir. 1986)); *Greenstone Shipping Co., S.A. v. Transworld Oil, Ltd.*, 588 F. Supp. 574, 584 (D. Del. 1984); *Puerto Rico Marine Management v. Ken Penn Amusement, Inc.*, 574 F. Supp. 563, 568 (W.D. Pa. 1983); *Sun Refining and Marketing Co. v. Goldstein Oil Co.*, 620 F. Supp. 121, 125 (E.D. Mo. 1985), aff'd in part, reversed in part, 801 F.2d 343 (8th Cir. 1986))); JULIAN COOKE, et al., VOYAGE CHARTERS, 13A.19 (4th Ed. 2014) ("Absent a specific clause permitting a given deduction, arbitrators and the courts routinely refuse to allow any attempt by a charterer to withhold freight.").

This rule and its purpose are discussed at length in *Greenstone Shipping Co., S.A. v. Transworld Oil, Ltd.*, 588 F. Supp. 574, 584-85 (D. Del. 1984):

> The American and English authorities universally hold that the liability of a Charterer to pay freight is an independent obligation payable regardless of any claims the Charterer may have for cargo damage, shortage, or contamination. *See The Olympic Brilliance*, 21 L1.L.R. 177, 177-78 (1981) ("It has been for a long time clear law that a shipowner is entitled to his freight without deduction and, notwithstanding that a charterer may have powerful counterclaims, they are matters which must be dealt with thereafter. He is not entitled to set them off against the freight."); *The Aries*, 1 L1.L.R. 334, 341 (1977) ("no defense of breach of contract or equitable defense or set-off can operate to diminish or extinguish a claim for freight."); *Compagnia DiNavigazione Mauritius Rome v. Kulukundis*, 182 F. Supp. 258, 263 (E.D.N.Y.1959), *aff'd.*, 277 F.2d 161 (2d Cir.1960) (liability to pay freight not discharged because of failure to deliver cargo in good condition); *Compania Naviera Puerto Madren S.A. Panama v. Esso Standard Oil Co.*, 1962 AMC 169, 170 (S.D.N.Y.1961) (freight is an independent covenant and payable regardless of cargo damage). *See generally* 2 Carver, Carriage By Sea, §§ 1669-71, 1724-26 and 1169-70, 1209-11 (13th ed. 1982) (freight payable notwithstanding claims for cargo damage and shortage and there is no right to set off damage or shortage claims against payment of freight). The reason for this rule is perhaps obvious but it is nonetheless important: The rule protects and promotes the commercial viability of shipping enterprises by allowing a shipper to collect his freight immediately upon delivery rather than after lengthy delay and litigation over whether a cargo owner is entitled to deduct his claims for damage or shortage from freight. A rule to the contrary would require a shipper to bear the risk and expense of carrying cargo to its destination without any assurance that the risk and expense undergone would be compensated at all and would allow a cargo owner to withhold freight by simply raising a damage or shortage claim. In this case, to allow Charterer to withhold payment of freight because of any claims for cargo damage, shortage or contamination would defeat the purpose of a well-established rule of law and would seriously undermine the commercial viability of not only the shipowner in this case, but of shipping enterprises everywhere. Therefore, unless there are explicit and clear provisions in the Charter Party permitting deductions from freight, Shipowner is entitled to freight regardless of Charterer's claims for cargo damage, shortage and contamination.

"The rule's purpose is to ensure that an owner/carrier under a charter promptly receives the freight charges so that his cash position and ability to continue operating are not affected by delay in payment as a result of claims on the part of the charterer-shipper." *H&A Trading Co. v. Margo Farms Del Caribe, Inc.*, No. 90-2650CCC, 1991 U.S. DIST. LEXIS 20768, *9 (D.P.R. Dec. 13, 1991). This is true even if the good are damaged or deteriorated. *Metallgesellschaft* at 281 (citing CARVER at 769); *see also Compagnia Di Navigazione Mauritius Rome v. Kulukundis*, 182 F. Supp.

7

258, 263 (E.D.N.Y. 1959), aff'd on opinion below, 277 F.2d 161 (2d Cir. 1960) ("This undertaking in the charter is an independent obligation and is not discharged because of failure to deliver the cargo in good condition . . . ."); 10 Williston on Contracts, 3d ed. ¶ 1079 at 88). Nonetheless, charters often improperly attempt to withhold freight, which claims are routinely disallowed. *See* Julian Cooke, et al., Voyage Charters, 13A.21 (4th Ed. 2014) ("The most common justification alleged by charterers for withholding freight is to obtain security for a cargo claim (e.g., shortage, contamination, spoilage), but such claims are routinely disallowed.") (citing to collection of cases and arbitrations decisions). Moreover, "[d]eductions for other types of counterclaims not based on cargo claims are also routinely disallowed." (citing to collection of arbitration decisions). *Id*. at 13A.22.

In this case, Laurel has wrongfully withheld USD 2,781,120.06 (not including interest and fees) for Deviation and Interim Port Costs invoiced by Seawolf on June 17, 2020. The voyage charter was embodied in a "FINAL RECAP."[2] Laishram Exhibit 1 at 1 – 11. The recap incorporated "BPVOY4" form charter party terms, including some bespoke clauses as well as additional chartering clauses attached at the end. *Id*. at 12 – 50. The Recap contains the following relevant clauses:

> DEMURRAGE RATE     : USD 60,000 PD/PR[3]
> . . .
> INTERIM PORT CLAUSE:
> --------------------
> CHARTERERS TO PAY FOR ADDITIONAL INTERIM LOAD/DISCH PORT AT COST WITH ADDITIONAL STEAMING TIME TO BE INCURRED FOR SUCH DEVIATION WHICH EXCEEDS DIRECT PASSAGE FROM FIRST LOADPORT TO FINAL DISCHPORT. TIME TO COUNT FROM ARRIVAL PILOT STATION INTERIM LOAD/DISCHARGE PORT UNTIL DROPPING LAST OUTWARD PILOT INTERIM LOAD/DISCH PORT I.E. NO

---

[2] RECAP is short for recapitulation. "A 'recap' communication, or 'fixture,' is recognized throughout the shipping industry as an agreement to a charter party's essential terms." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 148 (2d Cir. 2001).
[3] [per day pro rata]

>ALLOWANCE FOR NOTICE TIME, NOR DEDUCTION FOR SHIFTING EVEN FROM ANCHORAGE TO FIRST BERTH AND NO DEDUCTION FOR TIME LOST DUE TO TIDE, SEA AND WEATHER CONDITIONS. DEVIATION AND TIME USED TO COUNT AGAINST LAYTIME UNTIL LAYTIME HAS EXPIRED THEN TO BE CALCULATED AT DEMURRAGE RATE PER DAY PRO RATA PLUS COST FOR ADDITIONAL BUNKERS CONSUMED AS PER MASTERS TELEX STATEMENT DEVIATION TIME USED, BUNKERS CONSUMED (INCL BUNKERS CONSUMED FOR HEATING BUT ALWAYS EXLUDING BUNKERS CONSUMED TO COMPLETE ONE FULL LOAD/DISCHARGE OPERATION,) AND PORT COSTS AS PER AGENTS D/A TO BE PAID TOGETHER WITH FREIGHT AS PER OWNERS TELEXED INVOICE, WHICH LATER TO BE SUPPORTED BY HARD COPY DOCUMENTATION, UPON REQUEST. – ANY REFERENCE TO INTERIM PORT IN THE BELOW TERMS THAT ARE IN CONFLICT WITH THE ABOVE CLAUSE SHALL BE N/A
>
>- INTERIM PORTS CLAUSE
>
>CHARTERERS TO PAY FOR INTERIM LOAD/DISCH PORT(S) AT TIME PLUS COST. ADDITIONAL STEAMING TIME TO BE COMPENSATED FOR DEVIATION WHICH EXCEEDS DIRECT PASSAGE FROM FIRST LOADPORT TO FINAL DISCHPORT. TIME IN PORT TO COUNT FROM ARRIVAL PILOT STATION INTERIM LOAD/DISCHARGE PORT UNTIL DROPPING LAST OUTWARD PILOT INTERIM LOAD/DISCH PORT I.E. NO ALLOWANCE FOR NOTICE TIME, NOR DEDUCTION FOR SHIFTING FROM ANCHORAGE TO FIRST BERTH AND NO DEDUCTION FOR TIME LOST DUE TO TIDE, SEA AND WEATHER CONDITIONS. DEVIATION AND PORT TIME TO BE COMPENSATED AT DEMURRAGE RATE PER DAY PRO RATA PLUS COST FOR ALL BUNKERS (INCLUDING IFO AND MDO USED IN PORT) CONSUMED AS PER MASTER'S STATEMENT. DEVIATION, TIME USED IN PORT, BUNKERS CONSUMED AND PORT COSTS AS PER AGENT'S PROVISIONAL D/A TO BE PAID TOGETHER WITH FREIGHT AS PER OWNERS INVOICE, WHICH LATER TO BE SUPPORTED/ADJUSTED BY HARD COPY DOCUMENTATION WHEN RECEIVED BY OWNERS.

Laishram Exhibit 1 at 4 – 5, 7 – 8. The "Freight Rate" clause in BPVOY 4 further provides the following bespoke clause:[4]

> ***Eletson interim ports clause:***
> *If interim load/discharge port(s) used, charterers to pay all post cost plus deviation time including any time waiting outside port, and all time in port at demurrage rate ($17,000 PD/PR). Charterers also to pay for all bunkers consumed for deviation against owners estimated invoice with full*

---

[4] The "Eletson interim port clause" is not part of the BPVOY4 form charter.

9

> ***documentation to follow from owners.  All such additional costs to be paid by charterers with freight.  Interim load/discharge port is deemed to be any port between 1st load port and final discharge port.***

Laishram Exhibit 1 at 37 (Clause 31 – FREIGHT RATE).

The above referenced deviation and interim port costs are an extension of freight (i.e. the hire agreed upon between the owner or master for the carriage of goods from one port or place to another) and are due and owing upon delivery of the goods at the port of discharge as per owner's invoice. *See, e.g.*, *Hellenic Lines, Ltd. v. Director General of India Supply Mission*, 319 F. Supp. 821, 831 (S.D.N.Y. 1970) ("Demurrage is defined as extended freight and is the amount payable for delays by the receiver in loading or unloading cargo."); *NPR, Inc. v. Avant Import & Export*, No. 95-1417 (HL), 1996 U.S. Dist. LEXIS 20242, *7 (D.P.R. Dec. 3, 1996) ("the liability for [demurrage] stands on the same footing as liability for freight.").  The deviation and interim port costs being due and owing pursuant to the above clauses and the general maritime law is underscored by the fact that the interim port clause is included in the Freight clause BPVOY4, as a bespoke provision therein.  Further, the "Interim Port Clauses" in the fixture recap and the bespoke interim ports clause in the form charter make clear that deviation, time used in port, bunkers consumed and port costs are to be "paid with freight as per owners invoice."  Moreover, these are the same types of freight obligations previously withheld by Laurel, but later paid pursuant to a tripartite settlement agreement between the parties.[5]

It follows that "freight" and "Interim Ports" invoices are due upon delivery of the goods at the port of discharge, per owners invoice.  However, while Laurel remitted later payment on some

---

[5] Seawolf had asserted against Laurel in this action four separate claims arising under the Voyage Charter: (1) Deviation and Interim Port Costs incurred under the Interim Port Clause at the first loadport, (2) port costs at the second load port; (3) Freight for the sea voyage; and (4) the Deviation and Interim Port Cost incurred under the Interim Port Clause at the first discharge port (which claim is the subject of this motion).  *See* Seawolf's Verified Complaint (Dkt. # 8) at ¶¶ 9 – 15.  While Laurel has asserted a counterclaim against Seawolf in this action (*see* Laurel's Amended Answer and Counter Claim (Dkt. # 22) at ¶¶ 26 – 32), Laurel nonetheless paid the first three claims on a without prejudice basis.  *See* Dkt. # 31 at 2.

10

of Seawolf's freight costs, it has nonetheless improperly refused payment of Seawolf's Deviation and Interim Port Invoice for the time spent in Tanjung Pelepas anchorage (Malaysia). Seawolf's Deviation & Interim Port Invoice fall squarely within these payment clauses, and the time calculated at Tanjung Pelepas anchorage as Interim port time is supported by Charterer's orders for the Vessel to proceed to Tanjung Pelepas anchorage to partially discharge and load cargo and thereafter to proceed to Guangdong, China as the final discharge port. 56.1 Statement, ¶¶ 11 – 20. The invoice is backed up by documentary proof the Charterer's orders, the Masters' statement of facts, and Bunker Receipts. *Id*. at ¶¶ 11 – 20, 24 – 25. Laurel cannot deny it issued the very orders to deviate giving rise to the interim port costs that are the subject of this Motion.

Laurel had an independent obligation to pay freight, notwithstanding that it has subsequently asserted a counterclaim in this action. The facts and allegations related to Laurel's counterclaim are immaterial to this Motion because the additional freight owed by Laurel to Seawolf pursuant to the Interim Port Clause is owed without set-off or reduction. Laurel breached its independent obligation under the Voyage Charter by failing to promptly pay Seawolf's Deviation and Interim Ports invoice upon being invoiced for same, after delivery of the cargo, on June 17,2020. Such obligation exists regardless of whether Laurel has a cognizable claim for damage arising from any delay caused by a temporary breakdown of the Vessel. Should such a claim exist by Laurel, which Seawolf denies, that claim, even if proved, does not entitle Laurel to withhold or offset the amount set forth in the Deviation & Interim Port Invoice. This longstanding maritime rule is necessary to prevent charterers, such as Laurel in this case, the benefit of completion of the voyage and delivery of cargo while at the same time attempting to avoid paying freight which has been upheld to be sacrosanct.

## II.     CALCULATION OF DAMAGES

The Deviation & Interim Port Invoice includes charges for the Vessel's time at Tanjung Pelepas anchorage (44.275 days X $60,000 = $2,656,500) (less 2.5% brokers commission ($66,412.50)), and costs for bunkers consumed by the Vessel while at Tanjung Pelepas anchorage (483.17 of very low sulfur fuel oil at the cost of $342 USD per metric tons ($165,244.14) and 37.98 metric tons of low sulfur marine gas oil at the costs of $679 USD per metric tons ($25,788.42) ($191,032.62 in total)).  56.1 Statement at ¶ 25; Laishram Exhibit 11.

A Breakdown of these charges is as follows:

| Description | Commission | Amount |
| --- | --- | --- |
| Interim port time/ TG Pelepas: 44.275 days x $60,000 | 2.500% | USD 2,656,500.00 |
| Interim port bunker/vlsfo: 483.17mt x $342 | | USD 165,244.14 |
| Interim port bunker/lsmgo: 37.98mt x $679 | | USD 25,788.42 |
| **Sub total** | | **USD 2,847,532.56** |
| Less commission | | USD 66,412.50 |
| **Total Due** | | **USD 2,781,120.06** |

*Id.*

## III.     PRE-JUDGEMENT INTEREST

As of the date of this filing, Laurel has not paid the Deviation & Interim Port Invoice.  The Second Circuit has held that the awarding of pre-judgment interest is within the district court's discretion, bearing in mind with respect to the rate that the prevailing party is entitled to "the income which monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations."  *Indep. Bulk Transp., Inc. v. M/V Morania Abaco*, 676 F.2d 23, 26 (2d Cir. 1982); *see also, e.g., Moran Towing Corp. v Young*, 597 F. App'x 33 (2d Cir. 2015)

(affirming district court's award of 9% interest in a maritime matter pursuant to New York's pre-judgment interest rate). Here, the Voyage Charter states that the "construction, validity and performance of this Charter shall be governed by . . . US Law" and that "[t]he courts of the City of New York shall have exclusive jurisdiction over any dispute which may arise out of this Charter. *See* Laishram Ex. 1 - BPVOY4 at Clause 49. The prevailing interest rate for pre-judgment interest in the City of New York is 9%.[6] Seawolf issued to Laurel the Deviation and Interim Port Invoice on June 17, 2020 in the total amount of $2,781,120.06. As of October 20, 2021, interest accrued, calculated on a simple interest basis and upon New York's pre-judgment interest rate of 9%, is $336,020.26. Thus, the final balance due and owing as of October 20, 2021 is $3,117,140.32.

## IV.     ATTORNEYS' FEES

Under Fed. R. Civ. P. Rule 54(d)(2), Seawolf is entitled to an award of attorneys' fees and disbursements to be adjudged against Laurel in a fair and reasonable amount for Seawolf being forced to file the above captioned action against Laurel and the present motion for payment of freight, due and owing under the Voyage Charter. It is well settled in this Circuit that, while the so-called American rule dictates that the "prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser," *Hirschfield v. Bd. of Elections in City of New York*, 984 F.2d 35, 40 (2d Cir. 1993) (internal quotation marks and citation omitted), a "district court has the authority to award attorney's fees to the prevailing party when the losing party 'has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Eisemann v. Greene*, 204 F.3d 393, 395 (2d Cir. 2000) (citation omitted)."

As discussed above, Laurel who was not the owner of the Cargo and therefore did not, as a matter of law, itself suffer any actual loss for any alleged decrease in cargo value has acted in

---

[6] *See* NY CPLR § 5004 (2012).

bad faith and vexatiously, wantonly, and for oppressive reasons by its failure to pay freight, due and owing under the Voyage Charter since June 17, 2020.  There is no excuse or legal defense for non-payment of freight under U.S. maritime law or by agreement pursuant to the Voyage Charter.  But for Laurel's actions, Seawolf would not have been forced to seek relief by way of this action and this Motion specifically.  Seawolf will provide documentation to support the quantum of an award of attorneys' fees and costs no later than 14 days after the entry of judgment pursuant to Rule 54(d)(2)(B)(iii) or at the request of this Court.

## CONCLUSION

For all the reasons stated above, the Court should grant Seawolf's motion for partial summary judgment and issue an order in favor of Seawolf and against Laurel for payment of the Deviation and Interim Port Invoice, dated June 17, 2020, plus interest and attorney's fees.

Dated: New York, New York
October 20, 2021

HOLLAND & KNIGHT LLP

By: */S/ James H. Power*
James H. Power
Clayton J. Vignocchi
31 West 52nd Street
New York, NY 10019
Telephone: (212) 513-3372
james.power@hklaw.com
clayton.vignocchi@hklaw.com

*Attorneys for Seawolf Tankers Inc.*